**LYNCH CARPENTER, LLP**
Todd D. Carpenter (Cal. Bar No. 234464)
todd@lcllp.com
Scott G. Braden (Cal. Bar No. 305051)
scott@lcllp.com
9171 Towne Centre Drive, Suite 180
San Diego, California 92122
Telephone:　(619) 762-1910
Facsimile:　(858) 313-1850

*Attorneys for Plaintiffs
and Proposed Class Counsel*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| M.G. and J.H., individually on behalf of themselves and on behalf of all others similarly situated, | Case No. |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | |
| ASHLYNN MARKETING GROUP, INC., doing business as SE7EN, and DOES 1-50, inclusive, | <u>DEMAND FOR JURY TRIAL</u> |
| Defendants. | |

Plaintiffs M.G. and J.H. (collectively, "Plaintiffs")[1] bring this action on behalf of themselves, and all others similarly situated, against Defendants Ashlynn Marketing Group, Inc., doing business as Se7en ("Defendant" or "Se7en"), and Does 1 through 50, inclusive (collectively, "Defendants"). Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on personal knowledge.

## NATURE OF THE ACTION

1.    This is a civil class action against Se7en for its false, misleading, deceptive, and negligent sales practices regarding its Se7en brand 7-Hydroxymitragynine ("7-OH") tablet and shot products (collectively, the "Products," the "Tablets," or the "Shots").[2] These Products are sold in smoke shops, gas stations, and online storefronts as if they were benign herbal supplements—when in reality, they are chemically potent substances akin to opioids that cause powerful dependence, painful withdrawal symptoms, and severe psychological and physical harm.

2.    7-OH is a psychoactive alkaloid found in trace amounts in the leaves of the kratom plant (*mitragyna speciosa*), a tropical plant indigenous to Southeast Asia. While kratom itself has long been consumed in raw or powdered form for its stimulant and opiate-like effects, the 7-OH alkaloid is far more potent than kratom's primary alkaloid, mitragynine ("MG"), and acts on the same mu-opioid receptors in the human brain as morphine, heroin, oxycodone, and fentanyl.

3.    However, what consumers do not know is that the opiate-like effects produced by MG and 7-OH are not the result of novel chemical interactions in the brain. Rather, these alkaloids behave, in part, exactly like opioids. That is, the MG and 7-OH alkaloids

---

[1] Because this action concerns issues of addiction and medical status, Plaintiffs are filing under their initials for the sake of their personal privacy. Plaintiffs are reasonable consumers who fell victim to Defendant's omissions and misrepresentations about the addictive nature of kratom and 7-OH, which operates like an opioid, and became addicted as a result. Since addiction issues are still wrongly stigmatized, Plaintiffs are filing this matter anonymously but will reveal their names as necessary to the Court under seal.

[2] This includes Defendant's 30 mg 7-OH Tablets, 20 mg 7-OH Tablets, 15 mg 7-OH Tablets, and 30 ml 7-OH Liquid extract Shots.

found in the kratom plant bind to the same opioid receptors in the human brain as morphine, heroin, and other opiates and opioids.[3] Consequently, kratom consumption has the same risks of addiction, dependency, and painful withdrawal symptoms, among various other negative side effects as traditional opioids.

4.     But it gets worse. While both active alkaloids in kratom interact with the opioid receptors, 7-OH is substantially more potent than MG. Indeed, some studies have shown that 7-OH is ten times more potent than morphine in activation of these opioid receptors.[4] As a result, the consumption of 7-OH—even in seemingly low doses—can produce the same cycle of euphoria, physical dependence, rapid tolerance, and excruciating withdrawal symptoms associated with traditional opioid addiction.

5.     Raw kratom powder typically contains less than 0.05% 7-OH by weight. In contrast, Defendant's Se7en Products are specially formulated to contain concentrated or isolated doses of 7-OH—often in amounts equivalent to many times what occurs naturally in the plant. This makes Se7en significantly more dangerous and addictive than raw kratom or even traditional kratom extracts.

6.     While Defendant also sells raw kratom, primarily under the brand name Krave, that is not the subject of this lawsuit. Rather, this lawsuit concerns the *highly* potent 7-OH formulation it sells under the Se7en brand name, which Defendant disguises as flavored "kratom" Tablets (including the flavors cherry, grape, mango, pina colada, lemon, and various others) and liquid "shots" (including the flavors Blueberry Smash, Peach Mango, Strawberry Ice, and Watermelon Ice, and Unflavored Original).

7.     These Products are substantially more addictive than kratom and produce opioid-like withdrawal symptoms that are often described by users as worse than heroin or prescription painkiller withdrawal.

---

[3] An opiate is a substance derived from opium whereas an opioid is any substance that binds with the mu-opioid receptor.

[4] Genevieve M Halpenny, *Mitragyna Speciosa: Balancing Potential Medical Benefits and Abuse*, 8 (9) ACS Med. Chem. Lett. 898 (2017); Azin Behnood-Rod, et al., *Evaluation of the Rewarding Effects of Mitragynine and 7-Hydroxymitragynine in an Intracranial Self-Stimulation Procedure in Male and Female Rats*, 215 Drug & Alcohol Dependence 2 (2020) (finding 7-OH was 13-fold more potent than morphine).

8. Almost immediately after Se7en hit the market, consumer reports began to emerge online detailing the terrifying experiences of users who became rapidly addicted and suffered severe withdrawals. Many of these consumers thought they were purchasing a kratom product—or even a safe herbal supplement—only to find themselves chemically dependent and unable to stop using Se7en without medical intervention.

9. The general public is largely unfamiliar with kratom and its alkaloids. So, when it comes to "7-Hydroxymitragynine," a derivative of kratom with a torturously complex name, the public is even less aware of it and its negative effects. Even among kratom users, few understand what 7-OH is, let alone how it works in the brain. Defendant has capitalized on this knowledge gap by branding Se7en as a "next generation" kratom product without disclosing that it functions, in all meaningful ways, as an opioid.

10. Reasonable consumers associate opioids with prescription drugs and illegal narcotics—not "kratom alkaloid" products sold next to energy drinks and CBD gummies. They do not expect these Products to induce the same dependency, withdrawals, or long-term harm as heroin or oxycodone. But 7-OH is, in fact, extremely addictive, and as a result, countless unsuspecting consumers have developed 7-OH dependencies that have severely damaged their health, relationships, and finances.

11. Defendant has intentionally omitted this critical information regarding the dangers of 7-OH consumption from its Se7en packaging, labeling, and marketing materials. The Products contain no clear warnings regarding their similarity to opioids, their highly addictive nature, or the intense withdrawal symptoms that may follow even short-term use.

12. Defendant has deliberately chosen to exploit consumer ignorance for profit. Se7en's marketing emphasizes the "natural" or "kratom-based" character of Se7en while omitting or downplaying its narcotic potency. Defendant relies on this deception to draw consumers into compulsive use—and to keep them coming back. This strategy is not only dangerous and immoral—it is a violation of California law and public policy.

13.    Plaintiffs bring this action on behalf of themselves and all others similarly situated for Defendant's violations of: (i) California's Unfair Competition Law, Business and Professions Code §§ 17200, *et seq.* ("UCL"); (ii) California's Consumers Legal Remedies Act, Civil Code §§ 1750, *et seq.* ("CLRA"); (iii) California's False Advertising Law, Business and Professions Code §§ 17500, *et seq.* ("FAL"); (iv) breach of implied warranty; (v) unjust enrichment; and (vi) fraud by omission.

## JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because this case is a class action in which the aggregate claims of all members of the proposed Classes (defined below), exclusive of interest and costs, exceed $5,000,000, and at least one member of the proposed Classes is a citizen of a different state than Defendant.

15.    This Court has personal jurisdiction over Defendant because Defendant has engaged in conduct purposefully directed at California and has sufficient minimum contacts with the state and this District to render the exercise of jurisdiction constitutionally proper.

16.    Venue is proper in the United States District Court for the Central District of California, Western Division, pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to the claims occurred in this District. Additionally, Plaintiff J.H. resides in this District, purchased and used the Products here, and suffered harm in this District as a result of Defendant's misconduct.

## GENERAL ALLEGATIONS

**A.    Background and Pharmacology of Kratom and 7-OH**

17.    "Kratom" refers to the substance derived from the leaves of the *Mitragyna speciosa* plant (the "kratom plant"), a tropical tree indigenous to Southeast Asia. Kratom leaves have been used for centuries in traditional herbal medicine, particularly in Thailand, Indonesia, and Malaysia, where they were consumed for both their stimulant properties (when chewed raw) and sedative effects (when brewed as a tea).

18.     Kratom's long history of use in Southeast Asia does not equate to an endorsement of its safety. Thailand, for example, banned kratom in 1943 due to concerns about addiction and abuse.[5] Malaysia followed suit in 1952 under the Poisons Act. These bans reflect the longstanding recognition in those regions of kratom's risks.

19.     Kratom's effects are diverse and often inconsistent, depending on dosage, preparation, and individual biology. At low doses, it may act as a mild stimulant. At higher doses, it can produce opioid-like effects, including euphoria, sedation, and analgesia.

20.     In the United States, kratom began to gain popularity in the past decade and is now widely sold in smoke shops, gas stations, convenience stores, herbal stores, "head" shops, and online platforms. It is often marketed as an "herbal supplement" that purportedly helps with pain relief, anxiety, mood enhancement, and opioid withdrawal symptoms, and/or to obtain a "legal" or "natural" high—despite the lack of FDA approval for any of these treatments and increasing concerns over its addictive potential.

21.     Commercial kratom products are typically made by harvesting kratom plant leaves, drying them, and crushing them into a fine powder that is then packaged and sold in pouches, capsules, or liquid extracts.[6] These products are usually advertised as "natural" and "safe" alternatives to prescription medication.

22.     The primary psychoactive components in kratom are alkaloids—naturally occurring organic chemical compounds. The two most pharmacologically active alkaloids in kratom are MG and 7-OH. These chemicals interact with the central nervous system to produce a wide range of physiological effects.

23.     MG and 7-OH produce a wide spectrum of effects because they bind to multiple receptors in the brain, including adrenaline, D2 dopamine receptors, and serotonin receptors, all of which contribute to kratom's mood-lifting and stimulant-like effects. Most

---

[5] In 1943, Thailand banned the possession, use, and propagation of kratom, and later banned all kratom sales, imports, exports, and consumption all together. However, in 2021, Thailand decriminalized possession of kratom in response to a growing pressure on its justice system to fix the country's overcrowded prisons through liberalization of its drug laws.

[6] When kratom leaves are extracted into a liquid formulation, this is colloquially called a kratom "extract shot."

notably, they also bind to the mu-opioid receptors. It is this opioid receptor binding that causes the euphoric and analgesic effects commonly associated with kratom—and that also creates a serious risk of physical dependence and withdrawal.

24.    Defendant Ashlynn Marketing Group, Inc.'s Products, sold under the brand Se7en, are not traditional kratom products. Se7en is a highly concentrated, chemically refined version of kratom in which 7-OH is the primary active ingredient, while the other natural alkaloids are stripped away. These Se7en Products (sold in Tablet and liquid Shot form) represent a "next generation" iteration of kratom with dramatically enhanced potency, addictiveness, and health risk.

25.    In raw kratom powder, 7-OH typically comprises less than 2% of total alkaloid content or 0.05% by weight. By contrast, Se7en's Products contain pure or nearly pure 7-OH, making them exponentially stronger. Some Se7en formulations may contain does of 15 mg or more of 7-OH per serving—amounts many times higher than found in nature.

26.    While both MG and 7-OH activate the mu-opioid receptor,[7] their relative potencies differ significantly. 7-OH has a much higher binder affinity and opioid-like effect than MG, and studies show that when 7-OH is administered in concentrated, isolated doses, it presents a significantly greater risk of inducing physical and mental addiction in consumers than raw kratom. In fact, studies show that 7-OH's effect on the opioid receptors is approximately forty-six times more potent than MG, and thirteen times more potent than morphine.[8]

27.    Because of this, 7-OH is not merely similar to an opioid—it is an opioid, both in mechanism and effect. It carries the same addiction risks as traditional opioids, such as oxycodone and hydrocodone, and may induce even more intense withdrawal symptoms.

---

[7] The mu-opioid receptor produces the most addictive or habit-forming effects, such as euphoria and analgesia. For this reason, the mu-opioid receptor is known as "the gateway to addiction" because it is the receptor that all opioids activate to produce the classic opioid high feelings of euphoria, sedation, and pain relief.

[8] Steven C. Eastlack, et al., *Kratom—Pharmacology, Clinical Implications, & Outlook: A Comprehensive Review*, National Library of Medicine, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7203303.

28.     Addiction to opioids occurs when regular use causes the brain to adapt to the presence of the drug, requiring larger and more frequent doses to achieve the same effects. Once tolerance and physical dependence set in, withdrawal symptoms emerge when the drug is no longer consumed—often driving the user into a compulsive cycle of continued use just to avoid sickness. The tragedy of addiction is that users want to stop but cannot.

29.     All substances that act on the opioid receptors have a high risk of addiction and withdrawal symptoms, and 7-OH is no exception. These 7-OH withdrawal symptoms are widely documented and include insomnia, irritability, anxiety, depression, muscle and bone pain, diarrhea, chills, difficulty concentrating, sleep disturbance including restless legs, tearing up, runny nose, stomach pain, muscle spasms, diarrhea, decreased appetite, chills, temperature dysregulation, extreme dysphoria, malaise, and intense psychological distress. The experience can be severe, lasting for days or even weeks, depending on dosage and duration of use.

30.     Many consumers begin using 7-OH products like Se7en for mood enhancement, pain relief, or energy. But over time, they discover they no longer are using the Products to feel good—they are using them to avoid feeling horrifically sick.

31.     Se7en's ultra-potent 7-OH formulations drastically accelerate the addiction timeline. What might take months or years to develop with raw kratom can occur in a matter of weeks or even days with Se7en. As a result, consumers who believed they were trying a natural supplement quickly find themselves chemically dependent and physically trapped.

32.     Despite the serious health risks associated with 7-OH, Defendant fails to disclose these facts anywhere on the Se7en packaging, marketing materials, or online storefronts. Reasonable consumers—many of whom are attempting to avoid or overcome opioid addiction—are being sold a deceptively packaged and dangerously addictive opioid without proper warnings or informed consent.

**B.    The Rise of Kratom and 7-OH Addiction in the United States**

33.    Over the past decade, kratom has grown from a niche botanical to a major commercial product in the United States. As of 2021, the American Kratom Association estimated that kratom sales reached $1.3 billion annually, with an estimated 11 million to 15 million annual users within the United States. Studies show approximately one million United States residents use kratom monthly, and that two-thirds of those individuals use it daily.

34.    This explosive growth is due, in large part, to misleading marketing and regulatory gaps. Kratom is widely touted as a "safe," "natural," and "legal" substitute for painkillers, anxiety medication, antidepressants, and even as a treatment for opioid withdrawal. Kratom's marketing as a safe substitute for painkillers therefore appeals to consumers who falsely equate "natural" with "safe." It is also frequently marketed as a nootropic or "smart drug" due to its stimulant effects at low doses. These claims—paired with the lack of federal regulation—have made kratom attractive to consumers seeking relief or enhancement without realizing the addiction risks they are incurring.

35.    While kratom itself is underregulated and poorly understood by consumers, 7-OH—its far more potent derivative—is virtually unknown to the public. 7-OH products did not emerge on the retail market until approximately 2022 and began to proliferate in earnest in 2023, including through the introduction of Defendant's Se7en Tablets and liquid Shots.

36.    Most consumers have never heard of 7-OH. Even those familiar with kratom are often unaware that 7-OH is a separate, highly concentrated alkaloid derivative with dramatically enhanced potency and addictive potential. Many consumers falsely assume that 7-OH is simply a stronger or more refined version of kratom powder, without realizing it behaves pharmacologically like a synthetic opioid.

37.    Defendant and other 7-OH product sellers advertise them as energy enhancers, mood boosters, pain relievers, or tools for managing opioid withdrawal—all while failing to disclose any of the grave risks of addiction, dependency, and withdrawal. Some even

assure consumers that 7-OH is a <u>non-addictive</u> way to deal with opioid withdrawal. These 7-OH companies universally reiterate these purported "benefits" of 7-OH consumption, without disclosing any of its corresponding harms. These omissions are not merely negligent—they are materially deceptive.

38.     Consumers who use 7-OH products like Se7en often do so under the mistaken belief that they are safe, non-addictive supplements. When they abruptly stop using 7-OH, many are stunned to find themselves suffering from severe withdrawal symptoms indistinguishable from opioid withdrawal. Compounding the problem, there are no widely recognized treatment programs or medical protocols designed specifically for 7-OH addiction, leaving consumers without support or guidance.

39.     As awareness of 7-OH's dangers grows, many consumers have turned to online forums for help, such as the "Quitting Kratom" subreddit on Reddit.com. That forum, which had over 51,000 members as of June 2025, contains first-hand accounts describing the unexpected, severe, and at times life-threatening withdrawal symptoms consumers experienced after using 7-OH products.[9]

40.     These consumer reports are consistent and alarming. Below are a sampling of actual anonymized accounts posted publicly to Reddit:

i.     In one post titled **Do no take 7oh**, a user wrote:

I'm going to say this loud and clear for everyone in their early stages of quitting, currently, or have already quit. DO NOT take this 7oh shit. It's fucking poison. It's nothing like the extracts and it's a very VERY taxing drug on the body. I have done every single thing under the sun and I can honestly say with confidence that this is by far bar none the absolute worst drug I've ever taken when it comes to detoxing.

ii.     In another post titled **Beware of 7-Hydroxymitragynine,** a user wrote**:**

I ended up getting these extract pills that were 14mg of 7 Hydroxymitragynine per pill. Used them for about a week for some bad pain, and then got thrown into

---

[9] *See* r/quittingkratom, Rᴇᴅᴅɪᴛ, https://www.reddit.com/r/quittingkratom (last visited June 26, 2025).

aggressive withdrawal. I've been on a now 3 month taper journey off of just a week of using them. It's been hell. Trying to get there slowly tapering. Just wanted to put the PSA out there, something like [7-OH] might be tempting, and it is incredible for pain, but it threw me into awful withdrawal that's now forced me to have to taper off of it and take a dose every 12 hours. This was after 2 and a half years of regular Kratom use that never gave me withdrawal. This week of using [7-OH] though mixed with my 2 and a half years of Kratom experience created a withdrawal shitstorm that was never expected. Beware.

a.    **Another user responded**:

I don't know how you're cold turkey from [7-OH], I tried and it was worse than when I had to kick morphine. I've had to do a long and slow taper with 6grams of Kratom powder every 12 hours currently. The [7-OH] withdrawal is very scary, worse than any opiate I've been on.

b.    **Another User Responded**:

I started taking those because the guy suggested them now it's every day for 3 months. I can't stop and get bad withdrawals at 24 hr mark. I'm taking about 6 a day now and I'm spending over 1K per month now it's going to ruin me if I don't stop. I can't believe this is legal, idk what to do

iii.    In separate post another user wrote:

Guys I desperately need help. I have been taking [7-OH] for maybe 6 months. Like more than three a day. **The more research I do on them the more I realize they're not even Kratom and no one scientifically really knows anything about them.** I am going across the country tomorrow and am going to be CT for 8 days. I actually really want to stop and I've been trying to for a really long time, but I am terrified of the withdrawals. I don't know what to do. I actually upped my dose this week and have probably been taking more like five a day. I am so embarrassed to say that, I am now realizing that everyone is cautioning even the fucking American Kratom Society about

these things. I'm really worried about my mental health not to mention I am going to be with my wife/kids and parents for 8 days. I don't know what I was thinking. Any recommendations?

iv.    In another post titled **Could not and would not believe you all…**another user wrote:

Long time lurker, first time poster. I went CT three days ago… after using for 1 1/2 years. The last 3 months I've been exclusively abusing the [7-OH] tablets, a full pack of three a day. I told myself you were all exaggerating. I told myself you were all weak. Now I'm completely humbled and fully ashamed. The last three days I've experienced a fatigue and fever like I've never experienced before. Trying to fall asleep and stay asleep, is absolutely impossible. During the night I sweat through my sheets…during the day I feel like a walking corpse. And I caved. I took half a tablet today just to stop the WD symptoms I was feeling. Now my brain just wants to rationalize what I've done. But I know, deep down this was the wrong move…I'm truly ashamed. I share this post for the people like me, who are lurking or glancing at this subreddit from time to time and telling themselves "naw I'll be fine…I can handle the WD whenever I decide or if I ever stop." I share this post for future me to look at to read and see the seriousness of my addiction and situation. I know that next time I quit I need to be more prepared. If you abuse it the way I do…Kratom is robbing you of life, and you trade it willingly for a 2 hour high. There's so much more to life than getting high. Thank you to this community, I hope you all know how much reading your stories and struggles does for someone like me. Thank you 🙏🏼

41.    These are not isolated cases. They reflect a widespread and growing crisis: consumers who were misled into thinking they were buying a harmless supplement are now chemically dependent on a highly potent opioid-like substance, with no medical guidance or legal warnings to protect them.

42.    Other experiences with kratom (not necessarily the more potent 7-OH Products) described on the subreddit are similarly horrifying:

i.    **One user wrote:**

I started using kratom in pill and powder form a couple years ago. <u>I had no idea</u> it was addictive, and I liked how it made me feel.... so much that I went from using it a couple weekends a month to wanting to use it every weekend to wanting to use it every day. I upped my dose a whole bunch, and soon I started to realize that, when I didn't take it, I would start to get what seemed like withdrawals! WTF? I googled it and did some more research and learned that I was indeed going through withdrawals. I immediately decided to suck it up and get off that stuff and spend a week withdrawing. Unfortunately, it wasn't that simple. I was addicted. That poison was in my mind constantly. I started using again and, LONG story short and many MANY other withdrawal attempts later, I had lost my JOB, my boyfriend, and my personality. It landed me in the hospital many times actually. I was losing hair, my eyes looked horrible, my skin was horribly dry, and I was miserable. I decided to go to REHAB. Effing rehab for this sh!t.

ii.    **Another user shared:**

I just tapered down from 80gpd to 20, and the experience was so awful that I just decided to jump yesterday, figuring "Let's just get this over with already!" Well, I gotta tell you, last night may have been one of the roughest nights of my life. It felt like a bad acid trip. I got zero sleep. The RLS was so bad I kept getting out of bed, bundling up, which was exhausting in itself, and going for a loop around the property outside; while hoping to be able to crawl back in bed and actually sleep. Nope. It felt like I was being electrocuted!!! This is even with clonidine and gabapentin. But, I'm determined to NEVER go through that first night again! (And of course I was lamenting my rash decision to jump, and

DYING to take some K). But, there's no turning back now. I'm hoping I'll get some sleep tonight since I had none last night. Wish me luck please :).

    iii.    **Another user shared:**

I was the worst kratom addict I knew and now I'm coming up on 5 months sober. Let me first qualify VERY quickly… Multiple extract shots a day, crying on the way to the store, cut up all my credit cards multiple times (until I got Apple Pay), sent my credit cards to myself in the mail, got on oral naltrexone, got on vivitrol (the injectable shot), gave my wife my wallet, lied every day, ... Today I'm sober off of everything and almost 5 months clean. I don't crave alcohol or drugs anymore. Cravings were my biggest problem. I don't think about kratom all day any longer. I had to walk my sad @$$ all the way to a 12 step program in order to get help. I have to talk to other struggling people. I had to start working a program of recovery which i still work…My habit was $50 a day, and with a newborn and mortgage etc I'm still trying to climb out of that hole. But man, to go from complete self-hate to self-love makes everything worth it. I hated myself, not anymore.

43.    This Internet forum is filled with other accounts like these, and the stories are consistently the same: well-meaning people were looking to feel better by taking what they thought was an "herbal supplement," only to develop an opioid-like addiction. This anecdotal evidence makes clear that 7-OH's addictive potential is a material fact to reasonable consumers that, if known, would help inform their purchase and consumption decisions.

44.    Defendant's failure to warn consumers that 7-OH acts as a mu-opioid receptor agonist, induces physical dependency, and causes opioid-like withdrawals is not just unethical—it is unlawful. Reasonable consumers would find these omitted facts material to their decision to purchase and consume Se7en Products. Had they known the truth, many would not have purchased the Products at all, or would have paid substantially less.

**C.    Defendant Knew or Should Have Known It Was Selling a Highly Addictive Drug to Unsuspecting Consumers**

45.    Defendant manufactures and sells a line of 7-OH Products using advanced chemical extraction techniques to isolate and concentrate 7-OH—a potent opioid agonist.

46.    Despite this technical expertise, and despite its intimate awareness of 7-OH's effect on the human brain, Defendant deliberately omits any clear and conspicuous warning of the Products' addictive nature from its packaging, labeling, and front-facing marketing.

47.    Defendant has no plausible excuse for this omission. The pharmacological properties of 7-OH are well-established: it is a selective and highly potent mu-opioid receptor agonist, with some reports indicating significantly greater receptor affinity than morphine.[10] Scientific literature and firsthand consumer experiences alike establish that 7-OH presents a severe and foreseeable risk of addiction and withdrawal.

48.    As a manufacturer operating in a post-opioid-crisis regulatory climate, Defendant either knew or should have known the fact that its Products would cause physical dependency. Defendant's failure to disclose these risks is not mere negligence—it constitutes a knowing omission of material fact on its advertisements or in their Products' packaging in violation of basic consumer protection norms.

49.    The very act of chemically isolating 7-OH from raw kratom and marketing it as a retail supplement confirms Defendant's knowledge of its potency and intended effect. Yet, Defendant markets its 7-OH Products as if they are nothing more than over-the-counter supplements. Indeed, instead of appropriately labeling the Products as opioid analogs or controlled-substance-adjacent, Defendant package its Tablet and Shot Products in glossy, colorful designs more reminiscent of candy or energy drinks than of a highly addictive narcotic. Indeed, the Products at issue here are unfit for human consumption due to their

---

[10] *See, e.g.*, Kenjiro Matsumoto et al., *Antinociceptive Effect of 7-Hydroxymitragynine in Mice: Discovery of an Orally Active Opioid Analgesic From the Thai Medicinal Herb Mitragyna Speciosa*, 74(17) Life Sciences 2143-155 (2004), https://www.sciencedirect.com/science/article/abs/pii/S0024320503011664; *see also* Andrew C. Kruegel et al., *7-Hydroxymitragynine is an Active Metabolite of Mitragynine and a Key Mediator of its Analgesic Effects*, 5(6) ACS Central Science 992-1001 (2019), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6598159/.

highly addictive nature, the risk of severe withdrawal symptoms, and associated physical and psychological harms.

50. Most egregiously, Defendant's original tablet is visually indistinguishable from Percocet pills sold on the illicit market. The resemblance is not coincidental; it is a dangerous nod to street-level drug culture that could confuse consumers and embolden misuse.

51. Comparison images between Percocet tablets and Defendant's Tablets are reproduced below. On the left is a photograph of Percocet tablets. On the right is Defendant's Tablet Product.




***A comparison between Percocet and Defendant's Se7en Tablet Product***

52. As evidenced in the above images, Defendant mimics the look and feel of these prescription opioids which contain a combination of the powerful pain medications acetaminophen and oxycodone. The shade of beige is nearly identical, and Defendant even scores its Tablet Products in the identical manner to match the Percocet tablets. This conduct is outrageous, a moral and ethical failure, and in contravention of public policy.

53. This visual mimicry, when combined with the lack of prominent plain-language warnings, creates the false impression that 7-OH is recreational. It is not. It is a

psychoactive compound with binding affinity and withdrawal symptoms on par with morphine, and most consumers have no idea what they are actually ingesting.

54. Defendant's back-label disclosures, where they exist at all, are vague and hidden. These disclosures, pictured below, *sometimes* include the vague phrase "[r]egular use of alkaloids may lead to dependence and addiction for some users" buried in fine print on the bottom left corner of the back side of the packaging.[11] These non-prominent warnings are woefully insufficient for a substance that can cause almost-immediate, violent, opioid-like withdrawal symptoms.



---

[11] Plaintiffs are informed and believe and thereon allege that this language was only added very recently, well after Plaintiffs unwittingly became addicted to Defendant's Products, and Plaintiffs intend to quickly pinpoint in discovery when the so-called addiction warning was first introduced.

55.    These disclosures are the only disclosures Defendant provides and are on the back of the packaging. Reasonable consumers are not expected to "discover the truth" from "small print on the side of the box."[12] Further, a disclosure is meaningless if nobody can read it.[13] Here, the disclosures are not legible and must be blown up by at least 300% before they begin to be discernible.

56.    Meanwhile, Defendant's broader marketing campaign highlights only benefits: "flavorful, portable, and potent kratom experience," "quick and efficient effects," "excellent value per dose," "carefully crafted for consistency and purity," and a wide variety of fruity, enticing flavors.[14] It never discloses the flip side: that regular use can lead to debilitating withdrawal symptoms, compulsive re-dosing, and loss of autonomy over one's behavior.

57.    Defendant sells not just one addictive product, but a growing line of them. Its 30 mg 7-OH Tablets come in twelve flavors, its 20 mg 7-OH Tablets come in five flavors, its 15 mg Tablets come in six flavors, and there's five flavors of its 30 ml 7-OH liquid extract 7-OH Shot Products. This breadth of formulation reveals a systematic strategy to package and push addictive alkaloids to a wide consumer base. Defendant markets and sells its 7-OH extract Shot Products, pictured below, in the same vague and deceptive packaging as it does for its Tablet Products.

---

[12] *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 939 (9th Cir. 2008); accord *Kahn v. Walmart, Inc.*, 107 F.4th 585, 597 (7th Circ. 2024) (following *Williams* and collecting similar authorities); *Thornton v. Pinnacle Foods Grp. LLC*, No. 4:16–CV–00158 JAR, 2016 WL 4073713, at *3 (E.D. Mo. Aug. 1, 2016) (holding that "the mere presence of an ingredient statement on the back of a product does not eliminate the possibility that reasonable consumers may be misled") (internal quotation omitted).

[13] *See Smith v. No. 2 Galesburg Crown Fin. Corp.*, 615 F.2d 407, 418 (7th Cir. 1980), overruled on other grounds by *Pridegon v. Gates Credit Union*, 683 F.2d 182 (7th Cir. 1982) (holding that "required disclosures become meaningless if the consumer is unable to decipher them"); *Scott v. Enhanced Recovery Corp.*, No. CV-05-5338 (CPS), 2006 WL 1517755 at *4 (E.D.N.Y. May 31, 2006) (explaining that "disclosures may not be placed in minute or unreadable print").

[14] *See, e.g.*, *Se7en Kratom 7-Hydroxymitragynine Liquid Shot Watermelon Ice 30ml*, PURE LEAF KRATOM, https://pureleafkratom.com/products/se7en-kratom-7-hydroxymitragynine-liquid-shot-watermelon-ice-30ml.html (last visited July 2, 2025).



58.     Rather than take a precautionary approach given the public health implications of selling such compounds, Defendant has adopted a marketing strategy that actively downplays addiction risks in favor of slick design, flavor appeal, and therapeutic euphemism.

59.     Defendant's failure to provide clear, prominent, and accurate warnings is particularly indefensible given its superior knowledge of the chemical properties and health risks associated with 7-OH. Reasonable consumers—many of whom are seeking alternatives to opioids or recovery tools—have no way to discern from the packaging alone that they are purchasing a powerful opioid mimic.

60.     Defendant knows this. It understands that full transparency about 7-OH's opioid receptor binding profile and addiction potential would undercut demand for Se7en

Products and expose them to heightened scrutiny. That is why the company chose to say as little as possible—while giving just enough of a nod to "habit-forming" properties to feign compliance in fine print.

61.    That is not a warning. It is a calculated evasion.

62.    Addiction is not a theoretical risk—it is the foreseeable consequence of regular 7-OH use. Defendant's Products cause that addiction. By failing to disclose that reality, Defendant has breached a duty it owes to every consumer: the duty to disclose material health and safety risks associated with its Products.

63.    There is nothing on the face of Defendant's Products that would lead a reasonable consumer to believe they are purchasing a chemical compound with the addictive potential of an opioid. The packaging looks like a vitamin. The warnings are ineffective. The marketing is misleading.

64.    This is not an accident, it is a strategy. Defendant relied on the average consumer's ignorance of 7-OH to increase sales, build customer dependency, and entrench a recurring purchase model grounded in addiction, not satisfaction.

65.    Defendant omitted these warnings for one reason: disclosure would hurt sales. And so, rather than reduce demand, Defendant obscured the truth.

66.    This conduct is dangerous, unethical, and against public policy. It violates the principles of honest commerce and threatens public health in a time when the nation is still grappling with the fallout from decades of opioid addiction and pharmaceutical fraud.

67.    The opioid crisis has killed hundreds of thousands of Americans. Yet Defendant, fully aware of the chemical nature of 7-OH and its addictiveness, has inserted its Products into the consumer market with no legitimate warning regime, effectively adding fuel to the fire—solely for profit.

68.    Because the concealment of these facts concerns a material, safety-related defect in the very nature of Defendant's Products, Defendant had a continuous duty to disclose the true composition and addiction risks of those Products. As the manufacturer,

formulator, seller, and promoter of the Products, Defendant had superior and exclusive knowledge of these risks—and it actively chose to withhold them from consumers.

## PARTIES

69.    Plaintiff J.H. is a resident and citizen of Solvang, California, located in Santa Barbara County. In or around late 2023 or early 2024, he encountered Se7en-brand 7-OH Products for sale at a local smoke shop. With a personal history of substance use and a strong desire to avoid relapse, Plaintiff J.H. exercised caution in selecting substances and relied heavily on packaging disclosures to make informed decisions. The Se7en packaging provided no meaningful indication that the Products contained a potent, chemically isolated mu-opioid receptor agonist with addiction risks and withdrawal effects comparable to those of synthetic opioids. Any mention of 7-OH on the label failed to convey the true nature or danger of the compound. Believing that a legally sold product with no clear addiction warning could not pose serious risk, Plaintiff J.H. began using Se7en Products daily. Unbeknownst to him, the Product's active compound triggered a rapid onset of physical dependence. Within weeks, Plaintiff J.H. experienced severe withdrawal symptoms when attempting to reduce or skip a dose, including insomnia, panic attacks, full-body aches, temperature dysregulation, and debilitating anxiety. These symptoms forced him into continued use merely to function up until very recently when, despite suffering intense and major withdrawals, he succeeded in stopping his use. Had the Se7en packaging included a clear and accurate warning about the risk of addiction and withdrawal, Plaintiff J.H. would not have purchased or ingested the Product.

70.    Plaintiff M.G. is a resident and citizen of Palo Alto, California, located in Santa Clara County. He first learned about kratom through a friend and began using it regularly in 2023. In January 2025, Plaintiff M.G. began using Se7en-brand 7-OH Tablet Products after seeing them promoted as a cheaper alternative to his usual kratom products. He thereafter purchased Se7en Products regularly from local head shops, smoke shops, and gas stations in the Palo Alto area. At the time of his initial purchase, the Products' packaging, labeling, and store signage contained no warnings—either verbal or visual—

about the risk of addiction, withdrawal symptoms, or other serious health effects. Believing the Products to be safe and comparable to kratom, Plaintiff M.G. began daily use and quickly developed a physical dependence. At the height of his addiction, he was consuming approximately 200 mg of 7-OH per day and spending up to $500 per week to sustain his use. He first realized he was addicted when he attempted to stop taking the Products and experienced intense, opioid-like withdrawal symptoms, including cold sweats, nausea, and uncontrollable tremors. These symptoms were so severe that they made cessation extremely difficult, seemingly impossible. Only recently was Plaintiff M.G. able to discontinue use after gradually weaning himself off the Products. At no point did the packaging make any meaningful disclosure about how incredibly addictive the Products were or that they were capable of causing the kind of physical dependency and withdrawal symptoms he experienced. Had such warnings been provided, Plaintiff M.G. would never have purchased or consumed Defendant's Se7en Products.

71.    Defendant Ashlynn Marketing Group, Inc. is a corporation organized under the laws of the State of California, with its principal place of business in Santee, California. Defendant owns and operates a commercial website under the "Krave" brand and distributes its Se7en-brand Products through a network of third-party retailers, including smoke shops and online resellers. While Defendant publicly markets its Kratom and 7-OH Products under the Krave brand, it also secretly formulates, manufactures, and sells Se7en-brand 7-OH Products without disclosing its affiliation with the Se7en brand on its website or through any public-facing marketing materials. Upon information and belief, Se7en is among several unbranded or shadow-branded Products Defendant places into the stream of commerce and directs at California consumers, including Plaintiffs.[15] At all relevant times, Defendant knew or should have known that its products—including those under the Se7en brand—posed a significant risk of addiction and opioid-like withdrawal and failed

---

[15] Plaintiffs allege, on information and belief, that the absence of a standalone Se7en website is intentional—designed to conceal Defendant Ashlynn Marketing Group, Inc.'s role in formulating, manufacturing, and distributing the Products, and to prevent consumers from linking the Se7en brand to Ashlynn's broader kratom operations.

to meaningfully disclose these material facts on its packaging, promotional materials, or affiliated websites.

72.     Plaintiffs do not know the true names or capacities of the persons or entities sued herein as Does 1-50, inclusive, and therefore sue such Defendants by such fictitious names. Plaintiffs are informed and believe, and upon such information and belief alleges, that each of the Doe Defendants is, in some manner, legally responsible for the damages suffered by Plaintiffs and members of the proposed Classes as alleged herein. Plaintiffs will amend this Complaint to set forth the true names and capacities of these Defendants when they have been ascertained, along with appropriate charging allegations, as may be necessary.

## CLASS ALLEGATIONS

Plaintiffs bring this action pursuant to Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and all other Class members, defined as follows:

**Nationwide Class:**

All persons in the United States nationwide who, within the applicable statute of limitations period, purchased Se7en 7-hydroxymitragynine Products manufactured, distributed, or sold by Defendant.

**California Class:**

All persons in California who, within the applicable statute of limitations period, purchased Se7en 7-hydroxymitragynine Products manufactured, distributed, or sold by Defendant.

73.     Excluded from the Classes is Defendant, as well as its officers, employees, agents or affiliates, parent companies and/or subsidiaries, and each of its respective officers, employees, agents or affiliates, and any judge who presides over this action. Plaintiffs reserve the right to expand, limit, modify, or amend these Class definitions, including the addition of one or more subclasses, in connection with their motion for Class

certification, or at any other time, based upon, *inter alia*, changing circumstances and/or new facts obtained during discovery.

74.    ***Numerosity***: The members of the Classes are so numerous that joinder of all members is impracticable. Plaintiffs are informed and believe that the proposed Classes contain at least thousands of consumers throughout California and the United States who purchased Defendant's Se7en Products and have been harmed by Defendant's conduct as alleged herein. The precise number of members of the Classes is unknown to Plaintiffs at this time.

75.    ***Commonality and Predominance***: This action involves common questions of law and fact, which predominate over any questions affecting individual members of the Classes. These common legal and factual questions include, but are not limited to:

    a.    whether the packaging and advertising labels on Defendant's Products have the capacity to mislead reasonable consumers;

    b.    whether Defendant knew that its Se7en Products, containing isolated 7-OH, are highly addictive and cause physical and psychological dependence and opioid-like withdrawal symptoms;

    c.    whether Defendant had a duty to disclose that the 7-OH in its Se7en Products is addictive on the Products' packaging;

    d.    whether Defendant's conduct alleged herein violated the FAL, CLRA, and UCL;

    e.    whether Defendant's conduct alleged herein constitutes unjust enrichment;

    f.    whether Defendant's conduct constitutes a fraudulent omission;

    g.    whether Plaintiffs and the Classes are entitled to damages and/or restitution; and

    h.    whether an injunction is necessary to prevent Defendant from continuing to sell the 7-OH Se7en Products without addition and withdrawal risk-related warning labels.

76. **Typicality**: Plaintiffs' claims are typical of the claims of the other members of the Classes in that Plaintiffs and the Class members each purchased Se7en Products without knowing they were addictive, and each was injured in substantially the same manner by Defendant's uniform wrongful course of conduct—specifically, by paying for a Product that was materially misrepresented or not adequately disclosed to be an opioid-like substance with high addiction potential, based upon Defendant's failure to inform Plaintiffs and all others similarly situated that its Products are highly addictive, or pose a risk thereof, and are akin to opioids.

77. **Adequacy**: Plaintiffs will fairly and adequately protect the interests of the members of the Classes. Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no antagonistic or adverse interests to those of the Classes.

78. **Superiority**: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy for, *inter alia*, the following reasons: prosecutions of individual actions are economically impractical for members of the Classes; the Classes are readily definable; prosecution as a class action avoids repetitious litigation and duplicative litigation costs, conserves judicial resources, and ensures uniformity of decisions; some class members are unaware they are being harmed due to Defendant's deceptive conduct, and prosecution as a class action permits claims to be handled in an orderly and expeditious manner.

79. Defendant has acted or failed to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief with respect to the Classes as a whole.

80. Without a class action, Defendant will continue its unlawful, deceptive, and misleading practices that will result in further damages to Plaintiffs, members of the Classes, and the general public—who are also negatively impacted by the dregs of addiction—and will likely retain the benefits of its wrongdoing.

81.    Based on the forgoing allegations, Plaintiffs' claims for relief include those set forth below.

82.    Plaintiffs are informed and believe that Defendant maintains extensive computerized records through its online sales data, as well as through, *inter alia*, general marketing programs. Defendant has one or more databases through which a significant majority of members of the Classes may be identified and ascertained, and Defendant maintains contact information, including email and home addresses, through which notice of this action could be disseminated in accordance with due process requirements.

### FIRST CAUSE OF ACTION
**Violation of California's Unfair Competition Law ("UCL")**
**Business and Professions Code, §§ 17200, *et seq.***

83.    Plaintiffs re-allege and incorporate by reference every allegation set forth in the preceding paragraphs.

84.    Plaintiffs bring this cause of action individually and on behalf of the members of the proposed California Class against Defendant.

85.    The UCL prohibits unfair competition in the form of "any unlawful, unfair, or fraudulent, business act or practice and unfair, deceptive, untrue or misleading advertising and any act[.]" A practice is unfair if it: (1) offends public policy; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers. The UCL allows "a person who has suffered injury in fact and has lost money or property" to prosecute a civil action for violation of the UCL. Such a person may bring such an action on behalf of himself or herself and others similarly situated who are affected by unlawful and/or unfair business practices or acts.

86.    Defendant has committed unlawful, fraudulent, and/or unfair business practices under the UCL, including but not limited to (a) representing that its Se7en Products have certain characteristics they do not, in violation of California Civil Code § 1770(a)(5); (b) advertising goods with the intent not to sell them as advertised, in violation of California Civil Code § 1770(a)(9); (c) profiting from the sale of highly addictive synthetic substances while concealing their true nature to unsuspecting

consumers; and (d) failing to prominently disclose that its Se7en Products pose a serious risk of addiction, dependency, and withdrawal symptoms akin to opioids.

87.     Defendant's conduct has the capacity to deceive and mislead a significant portion of the public, including reasonable consumers acting under the impression that the Products are safe, natural, and non-addictive.

88.     Plaintiffs and the California Class were injured by Defendant's conduct because they paid money for Se7en Products they would not have purchased—or would have paid significantly less for—had they known the truth, but for Defendant's failure to disclose the addictive nature, or risk of addiction of the 7-OH in its Se7en Products. Such injury is substantial and not outweighed by any countervailing benefit to consumers or competition. Since consumers reasonably rely on Defendant's labels, and thus also Defendant's omissions, consumers themselves could not have reasonably avoided such injury because of the omission of material facts from the product packaging and marketing.

89.     Moreover, Defendant's Products pose an unreasonable health hazard because 7-OH is a highly addictive opioid-receptor agonist, and may induce serious withdrawal symptoms. Accordingly, Defendant had a duty to disclose the risk of physical and psychological dependence to consumers on the Products' labels, advertisements, and marketing materials.

90.     Pursuant to California Business and Professions Code § 17203, Plaintiffs and the California Class seek an order of this Court that includes, but is not limited to, an order requiring Defendant to (a) provide restitution to Plaintiffs and the other California Class members; (b) disgorgement of all revenues obtained as a result of Defendant's violations of the UCL; and (c) pay Plaintiffs and the California Class members' attorneys' fees and costs.

91.     Equitable relief is appropriate because Plaintiffs may lack an adequate remedy at law—for example, if damages do not fully compensate them for the premium they paid under false pretenses, such as if the damage resulting from the purchase of the Products is determined to be an amount less than the premium price of the Products. Without

compensation for the full premium price of the Products, Plaintiffs would be left without the parity in purchasing power to which they are entitled.

### SECOND CAUSE OF ACTION
#### Violation of California's False Advertising Law ("FAL")
#### Business and Professions Code, §§ 17500, *et seq.*

92.     Plaintiffs reallege and reincorporate by reference all preceding paragraphs.

93.     Plaintiffs bring this cause of action individually and on behalf of the California Class against Defendant.

94.     Defendant's acts and practices, as described herein, have deceived, and are likely to continue to deceive, California Class members and the public at large. As described throughout this Complaint, Defendant failed to disclose that its Se7en Products containing 7-OH are addictive, or carries a risk of addiction, on its Products' packaging.

95.     Defendant disseminated false, misleading, and deceptive advertising across California regarding its Se7en Products through its Se7en packaging, online marketing, and distribution partners, falsely suggesting that the Products were natural, safe, and non-addictive.

96.     This advertising was, by its very nature, unfair, deceptive, untrue, and misleading within the meaning of the FAL. Such advertisements were intended to, and likely did, deceive the public for the reasons detailed herein.

97.     Defendant's false, misleading, and deceptive advertising is ongoing and likely to continue misleading consumers unless stopped by judicial intervention because Defendant continues to misrepresent that its Products are safe and beneficial to consume.

98.     Defendant knew, or should have known, that in making and disseminating these statements, its advertisements were untrue and misleading in violation of California law. Defendant knows that the Se7en Products are highly addictive, or have a risk thereof, yet fails to disclose this fact to consumers.

99.     Plaintiffs and the California Class members purchased Defendant's Se7en Products based on Defendant's misrepresentations and omissions indicating that the Products are not addictive.

100.   Defendant's misrepresentations and non-disclosures of the material facts described herein constitute false and misleading advertising and, therefore, constitute a violation of the FAL.

101.   As a result of Defendant's misconduct, Plaintiffs and California Class members lost money in an amount to be proven at trial. Plaintiffs and the California Class are therefore entitled to restitution as appropriate for this cause of action.

102.   Plaintiffs and the California Class seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Defendant's unfair, unlawful, and fraudulent business practices; declaratory relief; reasonable attorneys' fees and costs under California Code Civil Procedure § 1021.5; and other appropriate equitable relief.

### THIRD CAUSE OF ACTION
**Violation of California's Consumers Legal Remedies Act ("CLRA"), California Civil Code, §§ 1750, *et seq.***

103.   Plaintiffs reallege and reincorporate by reference all preceding paragraphs.

104.   Plaintiffs bring this claim individually and on behalf of the California Class against Defendant.

105.   Plaintiffs and California Class members are "consumers" within the meaning of California Civil Code § 1761(d) of the CLRA, as they purchased goods for personal, family, or household purposes.

106.   Civil Code § 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which she or he does not have."

107.   Civil Code § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."

108.   Civil Code § 1770(a)(9) prohibits "advertising goods or services with intent not to sell them as advertised."

109.   Defendant violated Civil Code §§ 1770(a)(5), (a)(7), and (a)(9) of the CLRA by failing to disclose that its Se7en Products are highly addictive, or are potentially addictive, cause withdrawal symptoms akin to opioid withdrawal, and are an unreasonable health hazard and necessarily a fact that is material to reasonable consumers.

110.   Defendant's misrepresentations and omissions deceived, and have a tendency and ability to deceive, the general public.

111.   Defendant has exclusive or superior knowledge of 7-OH's addictive nature and pharmacological effects, which was not known to Plaintiffs or California Class members because Defendant failed to warn them.

112.   Plaintiffs and the California Class suffered harm as a result of these violations of the CLRA, Civil Code § 1750, because they have paid money for Se7en Product(s) they would not have purchased had they known the harms of 7-OH. As a result, Plaintiffs and the California Class are entitled to actual damages in an amount to be proven at trial, attorneys' fees and costs, declaratory relief, and punitive damages.

113.   On July 16, 2025, Plaintiffs' counsel sent Defendant a CLRA notice letter, which complies in all respects with § 1782(a). The letter was sent via certified mail, return receipt requested, and advised Defendant that it was in violation of the CLRA and demanded Defendant cease and desist from such violations and make full restitution by refunding the monies received therefrom. The CLRA letter stated that it was sent on behalf of all other similarly situated purchasers.

## FOURTH CAUSE OF ACTION
### Breach of Implied Warranty

114.   Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

115.   Plaintiffs bring this cause of action individually and on behalf of the Nationwide Class against Defendant.

116.   Defendant, as the designer, manufacturer, marketer, distributor, and/or seller of the Se7en Products, impliedly warranted that the 7-OH Se7en Products were of

merchantable quality and safe for human consumption, and not addictive and did not cause opioid-like withdrawal symptoms because it did not disclosure on the Products' packaging otherwise.

117.    Defendant breached its warranty implied in the contract for the sale of its 7-OH Se7en Products because the Products could not pass without objection in the trade under the contract description: the 7-OH Products were not adequately contained, packaged, and labeled as per Defendant's contract with Plaintiffs and the Nationwide Class members, and the Products did not conform to the implied affirmations of fact made by its marketing and packaging that the Products are not addictive, are not potentially addictive, and do not cause withdrawals per U.C.C. §§ 2-313(2)(a), (e), (f). As a result, Plaintiffs and the members of the Nationwide Class did not receive the goods as impliedly warranted by Defendant to be merchantable. The Products failed to meet minimum standards of merchantability as required by U.C.C. §§ 2-314 and 2-315.

118.    Plaintiffs and the Nationwide Class members purchased the Se7en Products in reliance upon Defendant's skill and judgment and the implied warranties of fitness for the purpose that the Products were reasonably safe, suitable, and fit for ordinary use.

119.    The Se7en Products were defective when they left Defendant's exclusive control.

120.    Plaintiffs and the Nationwide Class did not receive the goods as warranted.

121.    Plaintiffs are not in direct contractual privity with Defendant. However, under California law, privity is not required to assert implied warranty claims involving foodstuffs or other products intended for human consumption. Defendant marketed and sold its Se7en brand 7-OH Products as consumable dietary supplements to be ingested by consumers for their purported mood-enhancing and relaxing effects. Plaintiffs purchased and consumed the Se7ven 7-OH Products as intended. Despite these representations, the Products are unfit for human consumption due to their highly addictive nature, their risk of severe withdrawal symptoms, and the associated physical and psychological harms they cause. Defendant itself acknowledges on its website, kravekratom.com, that its (less potent)

Krave brand kratom products are "[n]ot deemed fit for human consumption by FDA."[16] This further underscores the unregulated and hazardous nature of these Products. Because the Se7en brand 7-OH Products were intended for ingestion but are unsafe for that purpose, the exception to the privity requirement for foodstuffs applies, and Plaintiffs are entitled to bring claims for breach of the implied warranty of merchantability regardless of privity.

122.    As a direct and proximate cause of Defendant's breach of its implied warranty, Plaintiffs and the Nationwide Class have been injured in fact and suffered harm because (i) they would not have purchased Defendant's Products on the same terms if they knew the truth that the Products were addictive and could cause opioid-like withdrawal symptoms; (ii) the Se7en Products do not have the characteristics, uses, or benefits as promised by Defendant; and (iii) Plaintiffs and proposed Nationwide Class members consumed addictive Products unfit for regular human ingestion, and suffered addiction, physical and psychological dependence, painful  withdrawals, and other adverse health consequences.

123.    On July 16, 2025, prior to filing this action, Defendant Ashlynn Marketing Group, Inc., was served with a pre-suit notice letter on behalf of Plaintiffs that complied in all respects with U.C.C. §§ 2-314 and 2-607. Plaintiffs' counsel sent Defendant a letter advising Defendant that it breached an implied warranty and demanded Defendant cease and desist from such breaches and make full restitution by refunding the monies received therefrom.

**FIFTH CAUSE OF ACTION**
**Unjust Enrichment**

124.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as fully stated herein.

125.    Plaintiffs bring this cause of action individually and on behalf of the Nationwide Class members against Defendant.

---

[16] Krave Kratom, https://www.kravekratom.com/ (last accessed June 27, 2025).

126.    Plaintiffs and the Nationwide Class conferred a benefit on Defendant in the form of the gross revenues Defendant derived from the money they paid to Defendant by purchasing Se7en Products under the mistaken belief that they were safe, non-addictive, and suitable to consume.

127.    Defendant had an appreciation and knowledge of the benefit conferred on it by Plaintiffs and the Nationwide Class members as it directly receives revenues from the sale of the Products.

128.    Defendant has been unjustly enriched in retaining the revenues derived from Plaintiffs' and the Nationwide Class members' purchases of the Products, and retention of such revenues under these circumstances is unjust and inequitable because Defendant failed to disclose on the Products' packaging the Products were addictive, or were potentially addictive, and similar to opioids. Defendant's misrepresentation and concealment of the safety and nature of the Products caused health-related and economic injuries to Plaintiffs and the Nationwide Class because they would not have purchased the Products or would have paid less for them if the true facts concerning the Products had been known.

129.    Defendant knowingly accepted and retained the benefits it derived in the amount of the gross revenues from sales of the Products to Plaintiffs and the Nationwide Class members.

130.    Defendant has thereby profited by retaining the benefit under circumstances that would make it unjust for Defendant to retain the benefit without paying restitution.

131.    Plaintiffs and the Nationwide Class members are, therefore, entitled to restitution in the form of the revenues derived from Defendant's sale of the Se7en Products.

132.    As a direct and proximate result of Defendant's conduct, Plaintiffs and the Nationwide Class members have suffered damages in an amount to be proven at trial.

133.    Equitable relief is appropriate because Plaintiffs may lack an adequate remedy at law, particularly if damages resulting from their purchase of the Products are determined

to be an amount less than the premium price of the Products, and Plaintiffs would be left without the parity in purchasing power to which they are entitled.

134.   Restitution may also be more certain, prompt, and efficient than other legal remedies requested herein. The return of the full premium price will ensure that Plaintiffs are in the same place they would have been in had Defendant's wrongful conduct not occurred, i.e., in the position to make an informed decision about the purchase of the Products absent omissions with the full purchase price at their disposal.

### SIXTH CAUSE OF ACTION
**Fraud by Omission**

135.   Plaintiffs reallege and reincorporate by reference all preceding paragraphs.

136.   Plaintiffs bring this claim individually and on behalf of the Nationwide Class against Defendant.

137.   Defendant distributed, marketed, and sold its Se7en 7-OH Products throughout the United States, including within the State of California.

138.   Defendant misrepresented that its 7-OH Se7en Products had attributes or qualities that they do not have by knowingly failing to disclose that 7-OH is highly addictive and can cause opioid-like withdrawal symptoms.

139.   Defendant possess superior knowledge of the addictive pharmacology of 7-OH, due to its technical role in isolating, concentrating, and formulating the compound into consumer-facing Tablets and Shots. Defendant has also received consumer complaints and online reports of opioid dependency and severe withdrawal effects.

140.   Defendant knew that the addiction and withdrawal risks of 7-OH are material facts that reasonable consumers would consider when deciding whether to purchase the Se7en Products and would influence their purchasing decisions because addiction is an unreasonable health hazard.

141.   Defendant had a duty disclose to Plaintiffs and to the Nationwide Class members these material facts that 7-OH is addictive and can cause withdrawal symptoms on the Products' packaging.

142.   Reasonable consumers, including Plaintiffs, justifiably relied on Defendant's omission of any clear warning or disclaimer, because it is reasonable to assume that a consumer product with opioid-like addictive properties and side effects would carry an adequate warning label on its packaging if it were dangerous or habit-forming.

143.   As a direct result of Defendant's fraudulent omissions, Plaintiffs and the Nationwide Class paid for Se7en Products they otherwise would not have purchased, or paid more for those Products than they would have, had they known the truth about 7-OH.

## **PRAYER FOR RELIEF**

Plaintiffs, on behalf of themselves and the proposed Classes, respectfully request that the Court enter judgment against Defendant as follows:

a.    certifying the proposed Classes and appropriate subclasses, and appointing Plaintiffs as Class Representatives and their counsel as Class Counsel;

b.    awarding actual, consequential, statutory, and punitive damages to Plaintiffs and Class members, including legal damages under the CLRA if and when Defendant fails to take corrective action within the 30-day statutory period following receipt of Plaintiffs' CLRA notice letter pursuant to California Civil Code § 1782(a);

c.    awarding restitution and requiring disgorgement of all monies improperly received by Defendant's unjust enrichment that Defendant obtained from Plaintiffs and the members of the Classes as a result of Defendant's unlawful, unfair, and fraudulent conduct;

d.    granting declaratory and injunctive relief, as permitted by law or equity, including enjoining Defendant from continuing the unlawful practices set forth herein, and requiring Defendant, with Court supervision, to identify and notify victims of its misconduct and provide pay them all money it is required to pay to provide restitution to all purchasers of the Products;

e.    ordering Defendant to undertake a nationwide corrective advertising campaign to inform consumers of the true risks associated with its Se7en Products;

f. awarding attorneys' fees and costs, including recoverable attorneys' fees and costs under the CLRA if and when Defendant fails to take corrective action within the 30-day statutory period following receipt of Plaintiffs' CLRA notice letter pursuant to California Civil Code § 1782(a); and

g. awarding any other further relief as the Court may deem necessary or appropriate.

### JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all issues so triable.

Dated: July 16, 2025

**LYNCH CARPENTER, LLP**

By:*/s/Todd D. Carpenter*
Todd D. Carpenter (Cal. Bar No. 234464)
todd@lcllp.com
Scott G. Braden (Cal. Bar No. 305051)
scott@lcllp.com
9171 Towne Centre Drive, Suite 180
San Diego, California 92122
Telephone:   619-762-1910
Facsimile:    858-313-1850

*Attorneys for Plaintiffs and*
*Proposed Class Counsel*

**CLRA Venue Declaration Pursuant to California Civil Code § 1780(d)**

I, Todd D. Carpenter, declare as follows:

1.    I am an attorney duly licensed to practice law in the State of California and an admitted member of the bar of this Court. I am a partner at Lynch Carpenter, LLP, counsel of record for Plaintiffs in this action. I have personal knowledge of the matters stated herein and, if called as a witness, I could and would testify completely thereto under oath.

2.    The Complaint filed in this action is filed in the proper venue for trial pursuant to California Civil Code Section 1780(d) because a substantial portion of the events alleged in the Complaint occurred in this District, including the marketing, sale, distributed, and/or distribution of the Products at issue to Plaintiffs and other Class Members. Plaintiff J.H. resides in Solvang, California, within this District.

3.    I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct. This declaration was executed in San Diego, California, this July 16, 2025.

*/s/ Todd D. Carpenter*
Todd D. Carpenter